680 F.2d 301
 3 Employee Benefits Ca 1653
 Francis VAN ORMAN, on his own behalf and on behalf of a
class of all Participants, Continuing Former Employees,
Pensioners, Beneficiaries and Contingent Survivors, as such
persons are defined in the Revised Retirement Plan of The
American Insurance Company, American Automobile Insurance
Company and Associated Indemnity Corporation ("TARP"), Plaintiff,
v.
The AMERICAN INSURANCE COMPANY, the American Automobile
Insurance Company, the Associated Indemnity Corporation,
Fireman's Fund Insurance Company, Fireman's Fund American
Life Insurance Company, TARP, and Fireman's Fund American
Retirement Plan("FARP"), Robert P. J. Cooney and Jack B.
McCowan, Defendants.
Nellie TAYLOR, Andrew Marsh, Ulice M. Hoover, Peggy Laing,
Richard Shultis and Waldermar Ogren, on their own
behalf and on behalf of all participants
and beneficiaries similarly
situated, Plaintiffs,
v.
The AMERICAN INSURANCE COMPANY, the American Automobile
Insurance Company, the Associated Indemnity Corporation,
Fireman's Fund Insurance Company, Fireman's Fund American
Life Insurance Company, Robert P. J. Cooney, Jack B. McCowan
and TARP, Defendants.
Francis Van Orman, on his own behalf and on behalf of all
participants and beneficiaries similarly situated,
and
Ulice M. Hoover, Nellie Taylor, Peggy Laing, Andrew Marsh,
Richard Shultis, and Waldemar H. Ogren, on behalf
of those and all other persons similarly
situated, Appellants in No. 81-2784.
The American Insurance Company, the American Automobile
Insurance Company, TheAssociated Indemnity Corporation,
Fireman's Fund Insurance Company,Fireman's Fund American
Life Insurance Company, TARP, and FARP, Robert P. J.Cooney
and Jack B.McCowan
and
The American Insurance Company, The American Automobile
Insurance Company, The Associated Indemnity Corporation,
Fireman's Fund Insurance Company, Fireman's Fund American
Life Insurance Company, Robert P. J. Cooney, Jack B. McCowan
and TARP, Appellants in No. 81-2785
The American Insurance Company, American Automobile
Insurance Company, Associated Indemnity Corporation,
Fireman's Fund Insurance Company, the Revised Retirement
Plan of the American Insurance Company, Fireman's Fund
American Retirement Plan, Robert P. J. Cooney and Jack B. McCowan,
and
Fireman's Fund Insurance Company, American Insurance
Company, American Automobile Insurance Company, Associated
Indemnity Corporation, the Revised Retirement Plan of The
American Insurance Company, Associated Indemnity
Corporation, Fireman's Fund American Life Insurance Company,
Robert P. J. Cooney, and Jack B. McCowan, Appellants in No. 81-2786.
 Nos. 81-2784 to 81-2786.
 United States Court of Appeals,
Third Circuit.
 Argued April 13, 1982.
Decided June 1, 1982.
 
 Edwin C. Landis, Jr., Jeffrey L. Reiner (argued), Meyner & Landis, Newark, N. J., Paul R. Lamoree, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for plaintiffs-appellants/cross-appellees.
 Albert G. Besser (argued), Irvin M. Freilich, Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney, P. A., Newark, N. J., Cameron W. Wolfe, Orrick, Herrington & Sutcliffe, San Francisco, Cal., for defendants-appellees/cross-appellants.
 Before SEITZ, Chief Judge, ADAMS, Circuit Judge and STAPLETON, District Judge.*OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 Francis Van Orman, on behalf of plaintiff class members, appeals two interlocutory rulings of the district court, certified pursuant to 28 U.S.C. § 1292(b) (1976). Defendants also appeal two rulings certified under section 1292(b) and seek review of another interlocutory order of the district court under 28 U.S.C. § 1292(a)(1) (1976).
 
 I.
 A. History of the Plan
 
 2
 These appeals involve a dispute over entitlement to the actuarial surplus in The American Retirement Plan (TARP). TARP was established in 1957 by The American Insurance Company for eligible employees of American and two of its subsidiaries, the American Automobile Company and the Associated Indemnity Corporation (the Affiliated Companies). The plan was funded by contributions from both employees and employers. Participants contributed a fixed percentage of their salaries, and the employer paid the remaining cost of the Plan in such amounts as "necessary on the basis of actuarial calculations to carry out the purposes" of TARP.
 
 
 3
 Upon electing to participate in TARP, each employee received a certificate which advised that the "(t)erms and conditions of payment shall be in accordance with (the TARP document) dated April 1957, which governs the rights, privileges and interests of the participants and named beneficiary." In addition, employees received a booklet that purported to summarize the features of TARP. Two letters also distributed to employees from Robert Z. Alexander, president of The American Insurance Company, described the booklet as a "detailed explanation" and an "outline of the principal provisions" of TARP, but cautioned that "(t)he formal plan is in itself the legal document that sets out in complete text the rights and obligations of the Company and ... Participants and their Beneficiaries." The booklet contained a similar proviso: "Complete details of the Plan are contained only in the Company's Revised Retirement Plan Dated April 1, 1957, which instrument governs the Plan and may be reviewed by eligible employees upon request. All statements in the foregoing outline and explanations are qualified by reference to the Plan itself."
 
 
 4
 Both the letter and the booklet summarize employees' rights under TARP. Mr. Alexander's letter stated that "(o)ne of the important features of (TARP) is that no employee can lose any part of the funds contributed by him, because all sums he has paid in are held in trust for his sole benefit." The booklet advised employees that, in "the event the Plan is terminated, all funds held in trust will be used for the benefit of retired employees and active Participants and the Beneficiaries of deceased employees."
 
 
 5
 In 1960, a revised booklet was distributed to employees, noting the employer's increased contributions to the plan and other changes in TARP. The booklet and the accompanying letter contained much of the same language that appeared in the 1957 documents and, in addition, the letter stated: "All sums (the employee) has paid as well as the Company contributions are held in trust in two of the nation's largest banks for the sole benefit of members of the Plan and cannot be used for any other purpose."
 
 
 6
 The TARP document was not distributed to employees, but was purportedly available for inspection at each branch office. Section 9.3 of the TARP document provides:
 
 
 7
 Notwithstanding any provisions of this Plan to the contrary, upon termination of the Plan, but only after all liabilities under the Plan shall have been satisfied, the Affiliated Companies shall be entitled to the net assets of the Trust Fund which shall remain by reason of the erroneous actuarial computation during the life of the plan.
 
 
 8
 Section 11.1 of TARP states, "Participation in this Plan shall not give Employees ... any right or interest in the Plan or Trust Fund other than as herein provided." Finally, section 11.3 provides that New Jersey law is to govern the construction and interpretation of TARP.
 
 
 9
 In 1963, Fireman's Fund Insurance Co. acquired the Affiliated Companies. To provide a uniform pension plan for all its employees, Fireman's Fund made Affiliated employees eligible to participate in the Fireman's Fund Retirement Plan (FARP), which was funded entirely by employer contributions. Simultaneously, TARP was amended so that no further benefits accrued and that no further contributions were made by either the employer or the employees after May 31, 1964. On the date TARP was "frozen," the market value of the fund's actuarial surplus[1] exceeded $3 million.
 
 
 10
 By 1975, the surplus was estimated to be $12 million. Fireman's Fund notified employees who had participated in TARP that it had tentatively decided to terminate TARP on December 11, 1975 and purchase a group annuity contract to provide for their retirement benefits. Fireman's Fund indicated that, pursuant to section 9.3 of the TARP document, the Affiliated Companies intended to retain the surplus. Several employees objected to the proposed termination, claiming that the booklets and letters distributed between 1957 and 1963 established their right to the TARP surplus upon termination.
 
 B. The Litigation
 
 11
 Thereafter, defendants sought a declaratory judgment that the proposed termination of TARP was proper. Plaintiff Van Orman successfully moved to intervene, and in January 1976, the class, consisting of retired and former employees of the Affiliated Companies, was certified.
 
 
 12
 While this action was pending, Fireman's Fund "reactivated" TARP as of January 1, 1979. TARP was amended to provide that all TARP participants would be retransferred into the plan from FARP, that no further FARP benefits would accrue to these employees after December 31, 1978, and that the retransferred participants would accrue benefits under TARP beginning January 1, 1979. Plaintiff class moved to enjoin defendants from reactivating TARP. The district court denied the motion, but required defendants to post a surety bond to cover any funds withdrawn from TARP as a result of the reactivation.
 
 
 13
 Plaintiffs' amended complaint asserted claims under the Employee Retirement Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1381 (1976 & Supp. II 1978), state contract law, and under federal and state securities laws. Three of plaintiffs' claims are involved in this appeal: 1) the TARP document includes the booklets and letters distributed to employees and therefore establishes the class' entitlement to the surplus (count II); 2) plaintiffs are entitled to the surplus because the booklets and letters fostered "reasonable expectations" that they would receive the surplus (count IV); and 3) the defendants' retention of the TARP surplus, or the use of the surplus in a reactivated TARP, would unjustly enrich defendants (count VI).
 
 
 14
 Ruling on motions for summary judgment, the district court rejected plaintiffs' argument that the TARP document included the booklets and letters. Nor did the court agree that the statements in the booklets and letters establish plaintiff class' right to the surplus on a theory of reasonable expectations. Relying, however, upon section 4044(d)(2) of ERISA, 29 U.S.C. § 1344(d)(2), and applicable treasury regulations, the court held that upon the termination of TARP, the employer may retain only that portion of the surplus attributable to employer contributions that result from erroneous actuarial computation. The court also ruled that an issue of fact remained as to what portion of the employer-contributed surplus resulted from erroneous actuarial computation.[2] As an alternative basis for declaring that plaintiff class was entitled to the surplus upon termination of TARP under the statute, the court found that retention of the surplus funds attributable to employee contributions would unjustly enrich defendants. Further, the court held that the use of surplus attributable to employee contributions to fund newly accruing benefits in the reactivated TARP would also unjustly enrich defendants.
 
 
 15
 The district court certified these determinations for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and this court granted leave to appeal. Defendants also filed a notice of appeal from paragraph 21 of the district court's order, which directed them to "exercise their fiduciary discretion within thirty days from the entry of this order and decide whether, by amendment or otherwise, an increase in TARP benefits is appropriate." Defendants characterize this as a mandatory injunction and assert appellate jurisdiction under 28 U.S.C. § 1292(a)(1).
 
 II.
 
 16
 In count II of their complaint, plaintiffs allege that they are entitled to the TARP surplus on the basis of the TARP document. The district court held that plaintiffs had no contractual right to the surplus, but denied defendants' motion for summary judgment. Both parties allege error.
 
 A. Plaintiffs' Contract Theory
 
 17
 Plaintiffs assert that the TARP document and the booklets and letters distributed to employees constitute a single, integrated agreement. They further contend that because the language in the booklets and letters conflicts with section 9.3 of the TARP document, settled principles of New Jersey contract law render the former language controlling. Although plaintiffs' integration claim rests exclusively on state law, neither the district court nor the parties considered whether it is preempted by ERISA. See 29 U.S.C. § 1144(a). Because of our disposition of this issue, we may assume, without deciding, that New Jersey law controls.
 
 
 18
 The district court agreed that the language in TARP conflicted with that contained in the booklets and letters.
 
 
 19
 Section 9.3 of the TARP document permits the employer "upon termination ... only after all liabilities under the Plan ... have been satisfied" the right to recapture any balance remaining by virtue of erroneous actuarial computation during the life of the plan. No mention of this provision is made in the booklets. On the contrary, P 14 of both the 1957 and 1960 booklets state, "(i)n the event that (TARP) is terminated, all the funds held in trust will be used for the benefit of" the TARP beneficiaries. The conflict is manifest.
 
 
 20
 (emphasis in original). The court held, however, that the booklets and letters were not part of the TARP document.
 
 
 21
 We recognize that, under New Jersey law, two or more writings may constitute a single contract even though they do not refer to each other. See Lawrence v. Tandy & Allen, 14 N.J. 1, 6, 100 A.2d 891, 894-95 (1953). Whether two writings are to be construed as a single contract, however, depends on the intent of the parties. See Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 304, 96 A.2d 652, 657 (1953); 4 Williston on Contracts § 628, at 909 (3d ed. 1961). We cannot say that the district court erred in finding that the express warning in the letters and booklets that only the TARP document itself was to govern the rights of employees shows a clear intent that the contract consists only of the TARP document.
 
 
 22
 Plaintiffs rely extensively on two decisions of the New Jersey Supreme Court, Klos v. Mobil Oil Co., 55 N.J. 117, 259 A.2d 889 (1969), and Onderdonk v. Presbyterian Homes, 85 N.J. 171, 425 A.2d 1057 (1981). In Klos, the court considered whether the effective date of an insurance policy was to be determined by reference to an advertising brochure, the application, or the policy itself. Only if the policy language controlled would the policy have been ineffective on the date of insured's death. In holding that the policy covered the insured at his death, the court did not find, as plaintiff suggests, that the statements in the brochure and application were part of the insurance contract. Rather, the court refused to give effect to the date provided in the policy to protect the reasonable expectations of the insured, as fostered by the application and brochure. There is no indication that the Klos court regarded the extraneous documents as part of the insurance policy. The court cited no case involving the integration of multiple documents into a single contract and grounded its decision on the finding that "the average layman who reads (the application form) reasonably expects he will be covered when he receives his policy." 55 N.J. at 126, 259 A.2d at 893.
 
 
 23
 Nor do we find support for plaintiffs' integration argument in Onderdonk. In that case, the court held that a residence agreement contained an implied covenant giving residents of a retirement community the right to periodic financial accounting reports. The court referred to solicitation materials distributed to prospective residents, but only to ascertain the intent of the parties. 85 N.J. at 183-86, 425 A.2d 1064-65. Because the court regarded the solicitation brochures merely as evidence of an implied agreement that was consistent with the written contract, it is inapposite to this case. Section 9.3 of TARP and the statements in the booklets and letters that only the TARP document was to control, preclude a finding of an integrated agreement. Moreover, section 9.3 of TARP precludes a finding of an implied contract. See West Caldwell v. Caldwell, 26 N.J. 9, 29, 138 A.2d 402, 412 (1958) (an implied contract "consists of an obligation arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words"). This result is in accord with decisions in other jurisdictions holding that when literature expressly states that it merely summarizes a pension plan, the master contract controls. See Adams v. Hercules, Inc., 245 Ga. 464, 265 S.E.2d 781 (1980); Spitznass v. First National Bank, 269 Or. 676, 525 P.2d 1318 (1974); Voight v. South Side Laundry & Dry Cleaners, 24 Wis.2d 114, 128 N.W.2d 411 (1964).
 
 
 24
 We do not regard Klos, Onderdonk, nor any of the other cases cited by plaintiffs, as persuasive authority for the proposition that New Jersey courts would consider the booklets and letters as part of the TARP document. Therefore, we affirm the district court's conclusion that the TARP contract itself does not entitle plaintiff class to the surplus.
 
 B. Erroneous Actuarial Computation
 
 25
 Defendants moved for summary judgment on count II, seeking a declaration that, under section 9.3 of TARP, plaintiffs are entitled to no portion of the surplus. Defendants relied on 26 C.F.R. § 1.401-2(b)(1) (1981), a treasury regulation that permits an employer to recapture any surplus "due to erroneous actuarial computation during the previous life of the trust." The district court held that this regulation must be read in pari materia with section 4044(d)(2) of ERISA, which permits the employer to recapture only that portion of the surplus attributable to his contributions.[3] The court concluded that the amount recoverable due to "erroneous actuarial computation" under the treasury regulation must be limited to employer contributions.
 
 
 26
 We agree that the regulation permitting employers to recapture surplus caused by erroneous actuarial computation must be limited by the provisions of section 4044(d). To hold otherwise would nullify an express statutory intent that the portion of the surplus attributable to employee contributions be distributed to employees upon termination. Defendants' reliance on In re C. D. Moyer Trust Fund, 441 F.Supp. 1128 (E.D.Pa.1977), aff'd mem., 582 F.2d 1273 (3d Cir. 1978), is clearly misplaced. In that case, the court held that the employer could recover the entire surplus due to erroneous actuarial computation. Because the plan at issue however, was funded solely by employer contributions, 441 F.Supp. at 1129, the court had no reason to consider the employees' rights to the surplus under section 4044(d)(2) of ERISA. We therefore affirm the district court's denial of defendants' motion for summary judgment.[4]
 
 III.
 
 27
 In count IV, plaintiffs argue that, even if the booklets and letters do not constitute part of the TARP document, the language contained in the less formal writings should nonetheless prevail over contradictory terms in the contract. To support this theory, they invoke the doctrine of "reasonable expectations," as developed by the courts of New Jersey in the insurance law area. We again assume, without deciding, that New Jersey law controls. The doctrine is grounded on the equitable principle that "(w)hen members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations." Allen v. Metropolitan Life Insurance Co., 44 N.J. 294, 306, 208 A.2d 638, 644 (1965) (citations omitted). It has been applied by New Jersey courts to limit policy provisions which, if read literally, would largely nullify an insurance policy. See Kievit v. Loyal Protective Life Insurance Co., 34 N.J. 475, 170 A.2d 22 (1961). In Klos, the court expanded the doctrine somewhat, holding that brochures and an application for insurance which fostered the insured's expectations as to the policy's effective date prevail over a contrary provision in the insurance policy. The doctrine differs from estoppel in that it does not require proof of reliance; rather, courts examine contractual language from the point of view of "the average member of the public." Kievit, 34 N.J. at 488, 170 A.2d at 26. Although New Jersey courts have not considered whether the doctrine is applicable to pension plans, we assume, without deciding, that they would hold that it is. Cf. Hurd v. Hutnik, 419 F.Supp. 630, (D.N.J.1976) (apparently applying doctrine to pension plan construction).
 
 
 28
 The district court rejected plaintiffs' contention that an average employee, upon reading the booklets and letters, would justifiably anticipate receiving the TARP surplus. The court found that the disclaimers contained in the disseminated material were adequate to put employees on notice that the TARP document governed their rights. After examining the language in the booklets and letters, the court concluded that plan participants were not led "to expect anything more than their defined benefits under the plan." Plaintiffs challenge these conclusions.
 
 A. The Sufficiency of the Disclaimers
 
 29
 Plaintiffs first argue that the district court erred in considering the disclaimers in its reasonable expectations inquiry because they failed to comply with Revenue Ruling 61-157, 1961-62 Cum.Bull. 67, 74. That ruling provides that when an employer chooses to inform employees about a qualified pension plan with a summary description, the summary "must apprise the employee that a copy of the complete plan may be inspected at a designated place on the company's premises during stated times." We agree that the warnings contained in the booklets and letters do not strictly comply with Revenue Ruling 61-157. Although the disclaimers advised employees that the plan could be inspected "upon request," they did not designate either the place or times for such an inspection.
 
 
 30
 Plaintiffs contend that the warning is a "legal nullity" because of its failure to comply with the revenue ruling. They rely on Gould v. Continental Coffee Co., 304 F.Supp. 1 (S.D.N.Y.1969), in which the court held that a plan summary controlled over contrary language in the plan itself. The court stated:
 
 
 31
 (D)efendant's failure, in its booklet, to designate a time and place on its premises for employees to inspect the plan, as required by Rev.Rul. 61-157 ..., should relieve plaintiff from the provisions thereof. The obvious intent of this Ruling is to protect the rights of beneficiaries of the Plan, and it would be subversive to this purpose if plaintiff were bound thereby despite defendant's failure to comply with the required notice provisions.
 
 
 32
 Id. at 3. See Dictaphone Corp. v. Clemons, 488 P.2d 226 (Colo.App.1971). The district court declined to follow the strict, per se rule of construction apparently advocated by the Gould court, holding that this court, in Anthony v. Ryder Truck Lines, 611 F.2d 944 (3d Cir. 1979), "did not regard strict compliance with Rev.Rul. 61-157 as a legal prerequisite to reliance upon a warning provision."
 
 
 33
 Even assuming, as plaintiffs argue, that Anthony is not dispositive of the issue here, we decline to adopt a per se rule. The revenue ruling is merely a guide for the qualification of plans under section 401(a) of the Internal Revenue Code, 26 U.S.C. § 401(a) (1976). See 1961-62 Cum.Bull. at 69. Nothing in the revenue ruling suggests that it should serve as a per se rule of contract construction, nor are we willing to accord it such significance. Moreover, there is no indication that New Jersey courts would regard it as a substantive rule of construction. Where, as here, plaintiffs received warnings on three documents that the formal TARP contract controlled, we see no reason why deviations from the form of the disclaimer prescribed by the revenue ruling should render the disclaimers completely ineffective.
 
 B. Reasonable Expectations
 
 34
 Plaintiffs also argue that the district court improperly applied the reasonable expectations doctrine. The district court examined the booklets and letters to ascertain the reasonable expectations of the average employee, and concluded:
 
 
 35
 (I)t is difficult for me to believe that any expectation of a lump sum payment over and above these (pension) benefits was fostered by the booklets. It is undisputed that the benefits described in the booklets have been, are being and will be paid in the future. This factor must be combined with the fact that in three different documents, the employee was informed of the existence of the plan document and, in a variety of ways, told that the plan document controlled. The letter "promises" of Mr. Alexander are even less explicit. Nothing in those letters leads one to expect that any lump-sum payment above the described benefits would be made.
 
 
 36
 (citations omitted). Plaintiffs contend that the district court misapplied the reasonable expectations doctrine by focusing on the class' expectation of a lump-sum payout. Instead, they argue, the court should have focused on whether the class expected that the TARP fund would be administered and used, prior to termination, for the exclusive benefit of the class. We are not persuaded that the district court erroneously narrowed the scope of its reasonable expectations inquiry. As a matter of logic, we find it difficult to perceive how plaintiffs' expectations would be frustrated by the defendants' retention of the surplus if nothing in the booklets and letters led them to expect that a surplus might arise. Thus, we do not believe that the district court improperly applied the reasonable expectations doctrine.
 
 IV.
 
 37
 In count VI, plaintiffs seek recovery of the TARP surplus on an unjust enrichment theory. The district court first held that, under New Jersey law, the doctrine of unjust enrichment is applicable despite the existence of a contract between the parties. Observing that section 4044(d)(2) of ERISA reflects Congress' view that "the equities pertaining to employee contributory plans mandate that distribution of surplus funds attributable to employee contributions be made to the beneficiaries," the court held that, upon termination, the employer's retention of surplus funds attributable to employee contributions would result in their unjust enrichment. The court further held:
 
 
 38
 For similar reasons, I believe that the use of surplus attributable to employee contributions to fund additional liabilities in a reactivated TARP is impermissible on unjust enrichment grounds. These obligations would have otherwise required contributions to FARP. Only a small percentage of TARP participants would accrue new benefits thereby benefitting from the TARP surplus. In effect, funds generated by employee contributions from 1957 to 1964 are being used to reduce Fireman's Fund's liability to FARP. I believe this use of funds to be impermissible on unjust enrichment grounds.
 
 
 39
 Defendants contend that the district court erred in holding that, under New Jersey law, the unjust enrichment doctrine may override existing contractual rights and obligations. Defendants also argue that ERISA preempts any claim to the surplus on the common-law theory of unjust enrichment and that such a remedy is not justifiable as a matter of federal law. Because we hold that the doctrine of unjust enrichment is inapplicable both under New Jersey law and as a matter of federal common law, it is unnecessary to decide the difficult question whether ERISA preempts the state remedy.[5]
 
 A. New Jersey Law
 
 40
 The district court held that under New Jersey law, the doctrine of unjust enrichment is applicable despite the existence of a valid contract. The court relied on a passage from a decision of the New Jersey Appellate Division stating that "quasi-contractual obligations arise independently of the parties' intent or the existence of a contract." Power-Matics Inc. v. Ligotti, 79 N.J.Super. 294, 306, 191 A.2d 483 (App.Div.1963). We believe the district court's reliance on this statement was misplaced and that New Jersey law is to the contrary: recovery under unjust enrichment may not be had when a valid, unrescinded contract governs the rights of the parties.[6]
 
 
 41
 We regard St. Paul Fire & Marine Insurance Co. v. Indemnity Insurance Co., 32 N.J. 17, 20, 158 A.2d 825 (1960), as the definitive statement on the doctrine of unjust enrichment in New Jersey. In that case, plaintiff insurance company sought to recover expenses it had incurred in successfully defending claims against the insured, who was covered by policies of both plaintiff and defendant. Defendant was contractually obligated to contribute to the costs of the defense only when an action resulted in either a judgment or a settlement. Because there was neither, the court held that defendant had no contractual obligation to contribute to defendant's expenses. The court also rejected plaintiff's unjust enrichment theory, holding that the "essential requirement of unjust enrichment of defendant does not appear.... (F)rom defendant's point of view, it cannot be said that it accepted a benefit which enriched it beyond its contractual right. Therefore, there could be no recovery in quasi-contract." 32 N.J. at 22, 158 A.2d at 828. We believe this statement from the state's highest court is determinative of New Jersey law.
 
 
 42
 In ruling on plaintiffs' quantum meruit claim (count V), which was not certified on this appeal, the district court recognized that "New Jersey law appears to preclude recovery ... where, as here, there is a legally subsisting express agreement, no rescission is sought and no contention that the express contract is void or did not exist." See C. B. Snyder Realty Co. v. National Newark & Essex Banking Co., 14 N.J. 146, 162-63, 101 A.2d 544, 533 (1953); Moser v. Milner Hotels, Inc., 6 N.J. 278, 280-81, 78 A.2d 393, 394 (1951) ("Having pleaded an express contract, the plaintiff cannot without showing a rescission, recover on quasi contract."). The district court, however, apparently believed that New Jersey courts would accord different treatment when the quasi-contractual remedy sought was unjust enrichment. We see no evidence in the caselaw of such disparate treatment. Restitution and unjust enrichment are both quasi-contractual in nature. See generally Palmer, Law of Restitution § 1.1, at 1-6 (1978). Particularly in light of St. Paul, we believe that New Jersey courts regard the existence of a valid contract as a bar to recovery under either theory.
 
 B. Federal Common Law
 
 43
 Plaintiffs contend that even if the unjust enrichment doctrine is inapplicable under New Jersey law, it is warranted as a matter of federal common law. It is clear that Congress intended federal courts to fashion a federal common law concerning pension plans under ERISA. See Murphy v. Heppenstall Co., 635 F.2d 233, 237 (3d Cir. 1980); In re C. D. Moyer Co. Trust Fund, 441 F.Supp. at 1131. The express congressional authorization of federal common law distinguishes this case from Milwaukee v. Illinois, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), in which the Supreme Court held that the 1972 amendments to the Federal Water Pollution Control Act precluded the application of a federal common law of nuisance. We thus must determine whether employees have a right, based on a federal common law doctrine of unjust enrichment emanating from ERISA, to any portion of the surplus.
 
 
 44
 As the United States Supreme Court has observed, ERISA is a " 'comprehensive and reticulated statute' which Congress adopted after careful study of private retirement pension plans." Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 510, 101 S.Ct. 1895, 1899, 68 L.Ed.2d 402 (1981) (quoting Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980)). It prescribes standards governing the "conduct, responsibility, and obligation for fiduciaries of employee benefit plans ... and (provides) for appropriate remedies, sanctions, and ready access to the federal courts." 29 U.S.C. § 1001. The statute contains a broad preemption clause, thus superseding all state laws as they relate to pension plans. 29 U.S.C. § 1144(a).
 
 
 45
 We believe that Congress' authorization of the creation of a federal common law of pension plans must be considered in light of the comprehensive nature of the statute. Where Congress has established an extensive regulatory network and has expressly announced its intention to occupy the field, federal courts will not lightly create additional rights under the rubric of federal common law. See Halcyon Lines v. Haenn Ship Corp., 342 U.S. 282, 285, 72 S.Ct. 277, 279, 96 L.Ed. 318 (1952) (declining to fashion a rule of contribution among joint tort feasors in the heavily regulated area of maritime personal injuries). Judicial creation of a right in such circumstances should be "necessary to fill in interstitially or otherwise effectuate the statutory pattern enacted in the large by Congress." United States v. Little Lake Misere Land Co., 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973) (quoting Mishkin, The Variances of "Federal Law", 105 U.Pa.L.Rev. 797, 800 (1957)). Thus, we are guided by the statutory scheme of ERISA. Cf. Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) (in deciding whether a private right of action for violation of federal statute exists "our task is limited solely to determining whether Congress intended to create the private right of action").
 
 
 46
 We are particularly reluctant to fashion a federal common-law doctrine of unjust enrichment when such a right would override a contractual provision. The district court found that section 9.3 of the TARP document, as modified by section 4044(d)(2) of ERISA, governed the distribution of the surplus upon termination. The contract does not afford plaintiffs any pre-termination right to the surplus and, in fact, expressly states that employees have no rights to the fund other than those provided in the contract. The existence of a contract, in our view, requires a particularly strong indication that the unjust enrichment doctrine will vindicate an important statutory policy. Two considerations lead us to this conclusion.
 
 
 47
 First, despite the extensive statutory scheme governing pension plans, Congress left many matters to the discretion of the parties. The Supreme Court has emphasized the primacy of plan provisions absent a conflict with the statutory policies of ERISA. In Alessi, retired employees challenged the validity of provisions in their pension plans that reduced a retiree's pension benefits by an amount equal to worker's compensation awards received subsequent to retirement. In holding that the provision did not violate the forfeiture provisions of ERISA, 29 U.S.C. § 1053(a), the Court stated: "(R)etirees' argument overlooks a threshold issue: what defines the content of a benefit that, once vested, cannot be forfeited? ERISA leaves this question largely to the private parties creating the plan." 451 U.S. at 511, 101 S.Ct. at 1900.
 
 
 48
 Second, under general principles of contract law, as in New Jersey, the presence of an agreement that has not been rescinded precludes application of the quasi-contractual remedy. See Craig v. Bemis Co., 517 F.2d 677, 684 (5th Cir. 1975) ("enrichment would not be 'unjust' where it is allowed by the express terms of the (pension) Plan"); Santovenia v. Confederation Life Assoc., 460 F.2d 805, 811 (5th Cir. 1972); Hogan v. Wright, 356 F.2d 595, 598 (6th Cir. 1966); Efco Importers v. Halsobrunn, 500 F.Supp. 152, 158 (E.D.Pa.1980); Restatement of Restitution § 107 & comment 1 ("a person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was agreed ... the other should give in return.").
 
 
 49
 We note that our inquiry thus differs from when a party to a pension plan seeks to enforce a contractual right that is not specifically sanctioned by ERISA. In Murphy v. Heppenstall, 635 F.2d at 239, for example, this court held that an employees' contractual right to recover pension payments in excess of those guaranteed by the Pension Benefit Guaranty Corporation was permissible because it was "not inconsistent" with the statutory scheme. In this context, we do not believe it is sufficient that a particular right would not contravene a statutory policy. Cf. Martin v. Hamil, 608 F.2d 725, 729-30 (7th Cir. 1979) (employer's recovery of mistakenly paid benefits barred because restitutionary remedy would "be directly counter to the legislative intent of ERISA"). Rather, we believe that the creation of a federal right in contravention of a pension contract requires a particularly strong affirmative indication that such a right would effectuate a statutory policy.
 
 1.
 
 50
 We first consider the district court's ruling that retention of the surplus upon TARP's termination would unjustly enrich defendants. The court characterized this remedy as an "alternative" ground for the employees' entitlement to a portion of the surplus upon termination under section 4044(d) (2) of ERISA. In fact, the remedy is entirely duplicative of employees' statutory rights. Moreover, section 9.3 of the TARP contract, as amended, provides that "any 'residual assets' of the plan ... which are not required to be distributed to employees in accordance with section 4044(d) of ERISA shall be distributed to (defendants)." In light of the express statutory and contractual entitlement to the surplus, we see little reason for the creation of this right as a matter of federal common law and therefore, will reverse the district court's ruling. Cf. Dependahl v. Falstaff Brewing Corp., 653 F.2d 1208, 1215-16 (8th Cir. 1981) (state cause of action of tortuous interference with contract preempted where ERISA provides similar remedy), cert. denied, --- U.S. ----, 102 S.Ct. 512, 70 L.Ed.2d 384 (U.S.1981).
 
 2.
 
 51
 The district court's holding that the use of the surplus to fund newly accruing benefits in the reactivated TARP would unjustly enrich defendants requires a different analysis. Because ERISA does not provide a pre-termination right to the surplus, we must ascertain whether such a right is necessary to effectuate a statutory policy.
 
 
 52
 The district court found support for its holding exclusively in section 4044(d)(2) of ERISA. Although the legislative history surrounding the provision is sparse, Congress apparently enacted section 4044(d)(2) because of equitable considerations. See H.R.Rep.No.93-533, 93d Cong., 2d Sess. 12-13, reprinted in (1974) U.S.Code Cong. & Ad.News 4639, 4650-51 ("The Committee believes it is unfair to permit the complete recapture by employers of surplus funds in terminated contributory plans, without regard to the fact that contributions by the workers helped to generate the surplus"); S.Rep.No.93-127, 93d Cong., 2d Sess. 30, reprinted in (1974) U.S.Code Cong. & Ad.News 4838, 4866. We perceive nothing in the legislative history of ERISA, however, that indicates that Congress believed the same "equitable principles" apply before a plan has been terminated. Indeed, it seems most likely that section 4044 was to have no effect other than at termination. See S.Rep., id. ("This (distribution) requirement is applicable only after plan assets have been used to satisfy plan liabilities"). Instead, we believe Congress intended the statutory provisions prescribing minimum standards of fiduciary conduct, see, e.g., 29 U.S.C. §§ 1103-06, to govern employees' pre-termination rights to the fund's assets, whether surplus or not. If, as plaintiffs assert, the defendants' present use of the surplus to fund newly accruing benefits in the reactivated TARP is improper, we see no reason why these provisions would be insufficient to remedy an alleged misuse of plan funds.
 
 
 53
 We believe the absence of any indication of legislative intent to support the district court's holding is telling. As the Supreme Court stated in the analogous area of implied private remedies. "The ultimate question is one of Congressional intent, not one of whether this court thinks it can improve on the statutory scheme that Congress enacted." Touche Ross, 442 U.S. at 578, 99 S.Ct. at 2490. Because we are unable to identify a statutory policy that could be served only by the creation of an unjust enrichment right to the surplus prior to termination, we believe the district court erred in applying the doctrine.
 
 V.
 
 54
 Defendants filed a notice of appeal from paragraph 21 of the district court's order directing them "to exercise their fiduciary discretion within thirty days ... and decide whether, by amendment or otherwise, an increase in TARP benefits is appropriate." The district court stayed the order pending disposition of this appeal. The defendants characterize the order as a mandatory injunction and, asserting that it was grounded on the district court's erroneous ruling on unjust enrichment, contend that it must be vacated. Because we do not believe that the order is an injunction appealable under § 1292(a)(1), we will dismiss the appeal for want of jurisdiction.
 
 
 55
 We believe the district court's order is more in the nature of a judicial housekeeping measure designed to assist the court in framing ultimate relief in the case. The district court is apparently considering the plaintiffs' request for termination of TARP as an ultimate remedy. Such a termination order would be unnecessary if defendants choose to distribute that portion of the surplus to which the plaintiffs may be entitled by increasing benefits under TARP. Although we express no opinion on the propriety of a judicial termination, we believe the district court's order was intended to assist the court in determining whether such a termination would be appropriate. In this respect, we think it is akin to the order compelling the preparation of a plan for desegregation considered in Hoots v. Commonwealth of Pennsylvania, 587 F.2d 1340 (3d Cir. 1978). There, the court held that such an order was not an injunction: "Rather, it is merely a step in a judicial proceeding leading to the formulation of such relief. Important issues regarding the nature and extent of the relief ... still remain to be resolved." Id. at 1351. See also Bradley v. Milliken, 468 F.2d 902, 902-03 (6th Cir.), cert. denied, 409 U.S. 844, 93 S.Ct. 45, 34 L.Ed.2d 83 (1972); Taylor v. Board of Education, 288 F.2d 600, 605 (2d Cir. 1961). Similarly, the order in this case does not provide plaintiffs with any relief. It merely requires defendants to "exercise their discretion" so that the district court may assess the need for relief. See International Products Corp. v. Koons, 325 F.2d 403, 406 (2d Cir. 1963) (orders appealable under section 1292(a)(1) "give or aid in giving some or all of the substantive relief sought by a complaint").
 
 
 56
 Moreover, appellate review of this order does not vindicate the primary purpose of § 1292(a): "to permit litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence." Baltimore Contractors v. Bodinger, 348 U.S. 176, 181, 75 S.Ct. 249, 252, 99 L.Ed. 233 (1955). Defendants have not suggested how the order directing them to exercise their discretion will cause them any harm, nor do we perceive any. Thus, we will dismiss the appeal for want of appellate jurisdiction.
 
 VI.
 
 57
 We will reverse that portion of the district court's order granting in part plaintiffs' motion for summary judgment on their unjust enrichment claim (count VI) and will affirm the other rulings of the district court certified for interlocutory appeal. Defendants' appeal from paragraph 21 of the district court will be dismissed for want of jurisdiction.
 
 
 
 *
 Honorable Walter K. Stapleton, United States District Judge for the District of Delaware, sitting by designation
 
 
 [1]
 "Actuarial surplus" is an estimate, based on certain actuarial variables, of the market value of the amount by which a plan's assets exceed its liabilities. A plan's liabilities include the amount required to fund accrued but unpaid retirement benefits for participants
 
 
 [2]
 A surplus resulting from "erroneous actuarial computation" arises when a plan's
 actual requirements differ from the expected requirements even though the latter were based upon previous actuarial valuations of liabilities or determinations of costs of providing pension benefits under the plan and were made by a person competent to make such determinations in accordance with reasonable assumptions as to mortality, interest, etc., and correct procedures relating to the method of funding.
 
 
 [26]
 C.F.R. § 1.401-2(b)(1) (1981)
 
 
 [3]
 Section 4044(d)(2) of ERISA, 29 U.S.C. § 1344(d)(2), provides:
 Notwithstanding the provisions of paragraph (1), if any assets of the plan attributable to employee contributions, remain after all liabilities of the plan to participants and their beneficiaries have been satisfied, such assets shall be equitably distributed to the employees who made such contributions (or their beneficiaries) in accordance with their rate of contributions.
 
 
 [4]
 The district court also held that a factual issue remained as to what portion of the employer's contribution was caused by erroneous actuarial computation. In so holding, the court appeared to reject defendants' contention that an erroneous assumption that the plan would be ongoing was an "erroneous actuarial computation" and thus that, to the extent that the surplus was caused by the freeze, it should revert to the employer. Defendants contend that this is erroneous
 We decline to address this issue in this appeal. We do not believe that the issue is included in the district court's certification order. The court did not mention this ruling in its memorandum accompanying the certification order. It noted only that it had concluded that "there remains a genuine issue of material fact as to whether the employer's portion of the surplus results from in whole or in part 'erroneous actuarial computation' made during the life of TARP." Moreover, even if we were to disagree with the district court on this issue, we would nonetheless affirm its denial of defendants' motion for summary judgment.
 
 
 [5]
 The broad supersedure clause in ERISA, 29 U.S.C. § 1144(a), does not apply "with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975." 29 U.S.C. § 1144(b). We note that, in the absence of congressional guidance, courts have encountered considerable difficulty in applying this standard. See, e.g., Winer v. Edison Brothers Stores Pension Plan, 593 F.2d 307, 313 (8th Cir. 1979) (" 'it is not at all clear what acts or omissions Congress referred to in (29 U.S.C. § 1144(b))' ") (quoting Bacon v. Wong, 445 F.Supp. 1189, 1192 (N.D.Cal.1978))
 
 
 [6]
 Plaintiffs' contention that "rescission of the contract in issue has in essence been effected" by the district court is without merit. The court specifically disclaimed such a result, noting that "(n)owhere in the vast sea of papers submitted in this case is rescission of the TARP contract sought as a remedy ... nor is it asserted that no contract was formed between defendants and the TARP participants."