773 F.2d 1402
 6 Employee Benefits Ca 2226
 Frank J. AMATO, Robert J. Andes, Ernest R. Buntin, Raymond
V. Carlisle, John J. Cengia, Nicholas Cicero, Joseph
Cilenti, Paul L. Coriaty, Robert C. Davis, Ronald D'Ellia,
Robert DeForge, Robert DeNunzio, Kevin Dunn, Ernest Ford,
Anthony J. Gargiulo, Norman Goldman, Gerald Green, Joseph A.
Gregurich, Thomas G. Harrington, Henry Kee Chee, Frank A.
Larkin, Salvatore Lifari, David Mallon, Frank P. Manzione,
Rudolph Mears, Richard W. Phillips, Nicholas F. Rotolo,
Bruce Rutherford, Robert Scheddin, Thomas W. Smith, Arthur
Tavenor, Eugene T. Tonissen, Felix Vales, Jr., and Leonard
L. Wisniewski, Plaintiffs-Appellants,
v.
WESTERN UNION INTERNATIONAL, INC., M.C.I. Communications
Corporation, and Microwave Maintenance
Corporation, Defendants-Appellees.
 No. 1000, Docket 84-7978.
 United States Court of Appeals,
Second Circuit.
 Argued April 8, 1985.
Decided Sept. 12, 1985.
 
 Richard A. Levy, New York City (Fanette Pollack, Nancy Goldhill, Eisner & Levy, P.C., New York City, of counsel), for plaintiffs-appellants.
 Greg A. Danilow, New York City (Michael J. Nassau, Stuart J. Baskin, Anthony E. Kaplan, Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), for defendants-appellees.
 Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D.C. (Michael L. Paup, Atty., Tax Div., Dept. of Justice, Washington, D.C., of counsel), for amicus curiae U.S.
 Before MANSFIELD, KEARSE and PRATT, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 The principal issue on this appeal is whether Western Union International, Inc. ("Western Union") and its corporate parents, Microwave Maintenance Corporation and M.C.I. Communications Corporation (collectively referred to as "MCI"), violated rights of Western Union's long-term non-bargaining unit employees under its Pension Plan ("Plan") by amending that Plan in November 1982 to reduce certain early retirement benefits for which they were or would have become eligible. Plaintiffs, long-term non-bargaining unit employees of Western Union, appeal from a judgment of the Southern District of New York, John E. Sprizzo, Judge, dismissing 12 counts of their complaint, which alleged that Western Union's Amendment of the Plan violated their rights under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Secs. 1001-1368 (1982), and under federal and state common law. We affirm in part, reverse in part and remand the case for further proceedings.
 
 
 2
 In the 1950s and early 1960s, when most of the plaintiffs-appellants were hired by Western Union, its Plan provided for two types of retirement benefits: (1) a "Class A" pension, which provided that a participating employee who had completed 20 or more years of credited service with Western Union would be eligible at age 55 to receive full benefits, and (2) a "Class 80" pension, which entitled an employee whose years of age plus years of service totalled 80 to similar full benefits. In 1972 the Class 80 pension was replaced by a "Class 75" pension under which employees with at least 20 years of service, whose age and service years totalled at least 75, would be eligible for full retirement benefits. In 1975, to meet ERISA's requirements, an "Age 65" pension was added, under which a full retirement benefit would become available to an employee upon his reaching 65 years, with the proviso that an employee might become eligible before reaching 65 for a different retirement benefit known as a Deferred Vested Benefit pension, which could be taken before age 65 on an actuarially-reduced basis.
 
 
 3
 The formula used by Western Union to calculate the amount of the benefits payable per year to an employee under the Class A, Class 75 and Age 65 pensions was the same: the employee was entitled to one and two-thirds percent (1 2/3%) on the average of his three highest consecutive years salary X his years of service. Since almost all of the plaintiffs-appellants had been employed by Western Union for 20 years prior to the amendment of its Plan they could look forward to receiving upon early retirement benefits under the Class A or Class 75 pensions. This prospect was changed shortly after the January 1982 "Purchase and Sale Agreement" between MCI and Xerox Corporation, by which MCI acquired WUI, Inc., a holding company whose subsidiaries included Western Union. In November 1982, MCI and Western Union adopted an Amendment to the Plan ("Amendment"), under which plaintiffs and all other non-bargaining unit employees would no longer be eligible for Class A or Class 75 pensions but only for Age 65 pensions or a deferred vested pension payable at age 65 or earlier on an actuarially-reduced basis. The effect of the amendment was to deprive plaintiffs of the higher unreduced benefits they would have received under Class A and Class 75 pensions upon early retirement. Instead, they would be forced to wait until age 65 if they wanted full benefits or receive an actuarially-reduced benefit if they retired before 65 years of age. Plaintiffs contend that the difference between the two monthly benefits for an employee retiring before 65 could be substantial, depending on his age and prior years of service, and that the amendment also had the effect of (1) releasing Western Union from its former obligation of contributing large sums to provide Class A and Class 75 pension benefits to the plaintiffs, and (2) freeing up for other purposes funds that had been put aside to provide for payment of the Class A and Class 75 pensions.
 
 
 4
 On March 10, 1983, plaintiffs-appellants commenced the present action by filing a complaint alleging in 15 Causes of Action that the Amendment violated their rights under (1) ERISA, 29 U.S.C. Secs. 1001-1368 (1982), (2) the Purchase and Sale Agreement between MCI and Xerox, and (3) state and federal common law. The principal ERISA claims are that the defendants' Amendment
 
 
 5
 (1) decreased plaintiffs' "accrued benefits" in violation of ERISA Sec. 204(g), 29 U.S.C. Sec. 1054(g), and Internal Revenue Code ("IRC") Sec. 411(d)(6) (quoted infra, p. 6042-43),
 
 
 6
 (2) amounted to unlawful self-inurement by Western Union, which is prohibited by ERISA Sec. 403(c)(1), 29 U.S.C. Sec. 1103(c)(1),
 
 
 7
 (3) constituted a breach of defendants' fiduciary duties imposed on them by ERISA Secs. 404(a)(1)(A), (B) & (D), 406(a)(1)(D), and 406(b)(1) & (2), 29 U.S.C. Secs. 1104(a)(1)(A), (B) & (D), 1106(a)(1)(D) and 1106(b)(1) & (2),
 
 
 8
 (4) unlawfully reduced plaintiffs' vested benefits, ERISA Sec. 404(a)(1)(D), 29 U.S.C. Sec. 1104(a)(1)(D) and ERISA Sec. 203, 29 U.S.C. Sec. 1053,
 
 
 9
 (5) failed to allocate and distribute assets to plaintiffs as required upon a partial termination of a plan, ERISA Sec. 4044, 29 U.S.C. Sec. 1344, IRC Sec. 411(d)(3), and ERISA Secs. 404(a)(1)(A), (B), and (D), 29 U.S.C. Secs. 1104(a)(1)(A), (B), and (D), and
 
 
 10
 (6) violated ERISA's notice and reporting requirements, ERISA Secs. 4041 and 4043, 29 U.S.C. Secs. 1341 and 1343.
 
 
 11
 In addition the complaint alleged that the Amendment
 
 
 12
 (1) violated specific provisions of the Plan and Trust Agreement documents, amounting to a breach of contractual obligations under state and federal common law,
 
 
 13
 (2) was a tortious interference with plaintiffs' contractual rights, thus violating both state and federal common law and ERISA Sec. 510, 29 U.S.C. Sec. 1140,
 
 
 14
 (3) rendered the defendants liable on principles of unjust enrichment,
 
 
 15
 (4) violated the terms of the defendants' Purchase and Sale Agreement, rendering defendants liable under ERISA Sec. 404(a)(1)(D), 29 U.S.C. Sec. 1104(a)(1)(D) and at common law, and
 
 
 16
 (5) subjected defendants to being estopped from denying plaintiffs' third party beneficiary rights under the Purchase and Sale Agreement.
 
 
 17
 Three Causes of Action (Thirteenth, Fourteenth and Fifteenth) allege claims under ERISA Sec. 510, 29 U.S.C. Sec. 1140, that were not dismissed by the district court: discrimination against plaintiffs, retaliation against plaintiffs (for having asserted their pension rights), and unlawful termination of employees to prevent their obtaining pension benefits. The complaint sought (1) appointment of a temporary receiver to take possession of the pension fund assets, (2) a declaration that the Amendment is null and void and that plaintiffs are entitled to the value of their accrued Class A and Class 75 pension benefits, (3) an injunction against further reduction of plaintiffs' benefits and retaliatory conduct and (4) damages and attorney's fees.
 
 
 18
 Upon defendants' motion to dismiss the first 12 Causes of Action pursuant to Fed.R.Civ.P. 12(b)(1) and (6), Judge Sprizzo in a reasoned opinion dismissed the first 12 claims except for that part of the Sixth Cause of Action which alleged that Western Union violated the notice and reporting requirements of ERISA Sec. 4043(b)(2), 29 U.S.C. Sec. 1343(b)(2), by failing to report a "reportable event," i.e., the Plan's reduction in the amount of benefits payable to employees under Class A and 75 pensions on early retirement. The district court concluded that ERISA's prohibition against any decrease in "accrued benefits", ERISA Sec. 204(g) and IRC Sec. 411(d)(6), applied only to benefits payable at normal retirement age (i.e., age 65), not to unreduced full benefits payable upon early retirement, which the court held not to be "accrued benefits", and that under ERISA Sec. 204(c)(3), 29 U.S.C. Sec. 1054(c)(3), the only accrued early retirement benefit is the actuarially-reduced equivalent of the full benefit payable at age 65.
 
 
 19
 Since he found that the Amendment did not reduce plaintiffs' "accrued benefits", Judge Sprizzo further concluded that Western Union's fiduciary obligations under ERISA Sec. 404(a) were not violated, that there had been no unlawful transfer of the Plan's assets in violation of ERISA Sec. 406, that there was no inurement of the Plan's assets to the benefit of the employer (Western Union) in violation of ERISA Sec. 403(c)(1), and that there was no requirement that Plan assets be allocated to Class A and Class 75 beneficiaries under ERISA Sec. 404 as if there had been a "partial termination" of the Plan under IRC Sec. 411(d)(3). The district court further held that, since there was no partial termination of the Plan, ERISA's "notice and reporting" provisions, Sec. 4043(a), did not require Western Union to so report but that its failure to report the decrease in the benefit payable under the Amendment did state a claim under ERISA Sec. 4043(b)(3).
 
 
 20
 Turning to the complaint's common law claims, plaintiff's allegation that the Amendment breached the terms of the defendants' Plan was dismissed in view of the district court's holding that Western Union's reduction in early retirement benefits did not violate ERISA. Plaintiffs' claim of violation of the Summary Plan Description was held to be unsupported since Western Union specifically reserved the right to change the Plan. Plaintiffs' claims of unilateral contract, interference with contractual relations, and unjust enrichment were dismissed on the ground that they were preempted by ERISA Sec. 514(a). In the exercise of his discretion Judge Sprizzo dismissed the complaint's pendent state claims because its federal claims had been dismissed. From the district court's decision plaintiffs appeal.
 
 DISCUSSION
 
 21
 Claim that the Amendment Unlawfully Decreased Accrued Benefit
 
 
 22
 The principal issue raised by this appeal, affecting the district court's dismissal of several causes of action stated in the complaint, is the construction to be given to ERISA Sec. 204(g), 29 U.S.C. Sec. 1054(g), and IRC Sec. 411(d)(6), which are alleged to have been violated by Western Union's 1982 Amendment. They provide:
 
 
 23
 "(6) Accrued benefit not to be decreased by amendment
 
 
 24
 "A plan shall be treated as not satisfying the requirements of this section if the accrued benefit of a participant is decreased by an amendment of the plan, other than an amendment described in section 412(c)(8), or section 4281 of the Employee Retirement Income Security Act of 1974."
 
 
 25
 The term "accrued benefit" is defined by ERISA Sec. 3(23), 29 U.S.C. Sec. 1002(23), as follows:
 
 
 26
 "(23) The term 'accrued benefit' means--
 
 
 27
 "(A) in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age, or
 
 
 28
 "(B) in the case of a plan which is an individual account plan, the balance of the individual's account."
 
 
 29
 See also I.R.C. Sec. 411(a)(7)(A)(i). ERISA Sec. 204(c)(3), 29 U.S.C. Sec. 1054(c)(3), in turn states:
 
 
 30
 "(3) For purposes of this section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, the employee's accrued benefit, or the accrued benefits derived from contributions made by an employee, as the case may be, shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2)."
 
 
 31
 See also I.R.C. Sec. 411(c)(3).
 
 
 32
 Plaintiffs-Appellants argue that the Amendment violated the foregoing provisions by reducing the benefits payable under the Class A and 75 Pensions since those benefits are "expressed in the form of an annual benefit commencing at normal retirement age," being calculated by the same formula (1.67% X average of 3 highest years' salary X years of service) used to determine a benefit payable at normal retirement age (i.e., age 65). The district court and Western Union, on the other hand, take the view that to be "accrued" within the meaning of the statute a benefit must commence at age 65 or, if payable earlier, be determined as the actuarially-reduced equivalent of the amount to which the employee would be entitled under a plan at age 65. Appellants, in turn, point out that the statutory definition of "accrued benefits" does not simply refer to a benefit payable at normal retirement age but to a benefit "expressed in the form of an annual benefit commencing at normal retirement age" (emphasis supplied). Since the Class A and 75 benefits are expressed in such a form, calculated by precisely the same formula and expressed as the same dollar amount payable at age 65, appellants contend they are "accrued benefits" within the meaning of ERISA Sec. 3(23), 29 U.S.C. Sec. 1002(23).
 
 
 33
 A similar statutory construction issue is presented with respect to ERISA Sec. 204(c)(3), 29 U.S.C. Sec. 1054(c)(3), supra, which the district court interpreted as meaning that when the amount of the benefit is to be determined "other than ... at normal retirement age" it entitles the beneficiary only to the "actuarial equivalent" of the benefit commencing at normal retirement age. Here again appellants point out that the district court and the defendants ignore the statutory language "determined as an amount other than an annual benefit commencing at normal retirement age" (emphasis supplied). Appellants argue that since the Class A and 75 benefits were determined as an amount calculated by the same formula as that to which the employee is entitled at normal retirement age, ERISA Sec. 204(c)(3), 29 U.S.C. Sec. 1054(c)(3), does not apply to the situation before us. In short, the statutory language was designed to insure against an employee's receiving less than the actuarial equivalent and not to affect provisions of a plan entitling him to more.
 
 
 34
 The language, purpose and legislative history of the statute favor the construction of the statutory provisions urged by plaintiffs-appellants. To interpret the statute's definition of "accrued benefit" as referring only to the "amount" of money payable at normal retirement age would read out of 29 U.S.C. Sec. 1002(23) the words "in the form of" or give them no force and effect. No early retiree (whether under WU's "Class A" or "Class 75" Plan) could reasonably expect to receive by way of pension an "amount" as high per year as the amount to which he or she would be entitled after waiting until 65 to retire. But if that early retiree's pension entitlement were stated in the same form as that to which he or she would be entitled at age 65 (i.e., in this case an amount equal to 1.67% X average of 3 highest years' salary X years of service) the risk of the early retiree's being pensioned off at an amount less than the actuarial equivalent of the age 65 benefit would be minimal or non-existent. Applying the rule that an effort should be made to give some reasonable meaning to words used in a statute rather than no meaning at all, Platt v. Union Pacific R.R. Co., 99 U.S. (9 Otto) 48, 58, 25 L.Ed. 424 (1878) ("Congress is not to be presumed to have used words for no purpose"); National Insulation Transportation Committee v. ICC, 683 F.2d 533, 537 (D.C.Cir.1982) ("a court must, if possible, give effect to every phrase of a statute so that no part is rendered superfluous"); Fulps v. City of Springfield, Tenn., 715 F.2d 1088, 1093 (6th Cir.1983) ("Required, as we are, to construe the language of a statute so as to avoid making any word meaningless or superfluous ..."); Zimmerman v. North American Signal Co., 704 F.2d 347, 353 (7th Cir.1983) ("As a general rule, a court should not construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous."), it is apparent that the "form of" language when read together with 29 U.S.C. Sec. 1054(c)(3) and in the light of the statute's legislative history, was designed to require that a plan assure a retiree of at least as much as an actuarially-reduced equivalent but not permit the employer to deprive him of any more that might be provided by the plan.
 
 
 35
 The foregoing interpretation is confirmed not only by the statute's purpose but also by its general legislative history, the interpretation given to it by the Internal Revenue Service (IRS) as the "long recognized ... primary authority ... in construing the Internal Revenue Code," Bob Jones Univ. v. United States, 461 U.S. 574, 596, 103 S.Ct. 2017, 2031, 76 L.Ed.2d 157 (1983), and the views of other courts called upon to construe the same statutory provisions.
 
 
 36
 Turning first to the statute's legislative history, there can be no doubt that ERISA was enacted for the purpose of assuring employees that they would not be deprived of their reasonably-anticipated pension benefits; an employer was to be prevented from "pulling the rug out from under" promised retirement benefits upon which his employees had relied during their long years of service. There was public concern "that despite the enormous growth [in employee benefit plans] many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans." ERISA Sec. 2(a), 29 U.S.C. Sec. 1001(a) (Congressional findings and declaration of policy).
 
 
 37
 "The provisions of S. 4 are addressed to the issue of whether American working men and women shall receive private pension plan benefits which they have been led to believe would be theirs upon retirement from working lives. It responds by mandating protective measures, and prescribing minimum standards for promised benefits." S.Rep. No. 127, 93d Cong., 1st Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4639, 4838.
 
 
 38
 Crucial to the working of the new legislation were its minimum funding requirements. ERISA Sec. 203, 29 U.S.C. Sec. 1053. But since the vesting standards require that a certain percentage of an employee's accrued benefit have vested by a certain date, ERISA's vesting provisions could be thwarted if employers were permitted too much latitude in defining accrued benefits. As Senator Williams, Chairman of the Senate Committee on Labor and Public Welfare, stated
 
 
 39
 "[T]he vesting provisions apply to whatever benefit an employee has accrued under a plan. It is, therefore, important to assure that a plan's accrual formula is not inconsistent with the statutory purpose reflected in the bill's vesting provisions. A basic concern was that a plan not be permitted to use an accrual formula ... to subvert the statutory intent to provide meaningful vested rights...." 120 Cong.Rec. S. 15737 (daily ed. Aug. 22, 1974) (statement of Senator Williams), reprinted in 1974 U.S.Code Cong. & Ad.News 5177, 5180.
 
 
 40
 Thus, although ERISA has retained a system of voluntary pension plans, encouraged by favorable tax treatment for contributions, and has established minimum requirements for participation, vesting, and funding, it is "employee-oriented" and designed to assure that, when private parties set higher standards, as they have the right to do, see S.Rep. No. 383, 93d Cong., 1st Sess. reprinted in 1974 U.S.Code Cong. & Ad.News 4890, 4931, Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 511, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981), "employees with long years of employment and contributions [will] realize anticipated pension benefits." Reuther v. Trustees of Trucking Employees, 575 F.2d 1074, 1077 (3d Cir.1978).
 
 
 41
 In support of its opinion that an "accrued benefit" does not embrace unreduced early retirement benefits payable under a pension plan, the district court mistakenly relied upon an excerpt taken out of context from the following statement in the House Report on ERISA, which did not relate to the question before us:
 
 
 42
 "In the case of a defined benefit plan the bill provides that the accrued benefit is to be determined under the plan, subject to certain requirements. The term 'accrued benefit' refers to pension or retirement benefits and is not intended to apply to certain ancillary benefits, such as medical insurance or life insurance, which are sometimes provided for employees in conjunction with a pension plan, and are sometimes provided separately. To require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income. Also, where the employee moves from one employer to another, the ancillary benefits (which are usually on a contingency basis) would often be provided by the new employer, whereas the new employer normally would not provide pension benefits based on service with the old employer. Also, the accrued benefit to which the vesting rules apply is not to include such items as the value of the right to receive benefits commencing at an age before normal retirement age, or so-called social security supplements which are commonly paid in the case of early retirement but then cease when the retiree attains the age at which he becomes entitled to receive current social security benefits, or any value in a plan's joint and survivor annuity provisions to the extent that exceeds the value of what the participant would be entitled to receive under a single life annuity." H.R.Rep. No. 807, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4639, 4670, 4726 (emphasis supplied); see also H.Conf.Rep. No. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 5038, 5054.
 
 
 43
 When taken out of context the emphasized phrase might appear to refer to early retirement benefits generally. However, the context demonstrates that Congress was not referring to unreduced early retirement benefits (which are not mentioned) but to benefits that are temporary or ancillary in nature (e.g., medical or life insurance, disability benefits and social security supplements), which a new employer would normally be expected to provide. Social security supplements which cease upon the employee's reaching normal retirement age and the excess in value of joint and survivor annuity provisions over those of a single annuity differ entirely from unreduced retirement benefits to which an employee might become entitled under a retirement plan. The House Report therefore sheds no light on the meaning to be given to the term "accrued benefit" in the present context.
 
 
 44
 Although the legislative history of ERISA as originally enacted is silent with respect to the issue of statutory construction before us, the history of the pertinent provisions of the 1984 amendment to ERISA, the Retirement Equity Act of 1984, Pub.L. 98-397, 98 Stat. 1426, is both relevant and informative. Section 301(a)(2) of the 1984 Act, now codified as 29 U.S.C. Sec. 1054(g), amplifies the language of old Sec. 204(g), 29 U.S.C. Sec. 1054(g), as follows:
 
 
 45
 "(g) Decrease of accrued benefits through amendment of plan
 
 
 46
 "(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) of this title.
 
 
 47
 "(2) For purposes of paragraph (1), a plan amendment which has the effect of--
 
 
 48
 (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
 
 
 49
 (B) eliminating an optional form of benefit,
 
 
 50
 with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy. The Secretary of the Treasury may by regulations provide that this subparagraph shall not apply to a plan amendment described in subparagraph (B) (other than a plan amendment having an effect described in subparagraph (A))."
 
 
 51
 As can readily be seen, the expanded Sec. 204(g), if it had been in effect in 1982, would have barred the Western Union Amendment.
 
 
 52
 The House and Senate Committee Reports accompanying the revised Sec. 204(g) describe (as an example of the statute's intent) a plan remarkably similar to Class A and 75 pensions, under which an employee would receive unreduced early retirement benefits if he attained age 55 after 30 years of service, calculated under a similar formula, 1% of his average pay per year of service. The example points out that a 50-year old employee who had completed 25 years of service with an average pay of $10,000 would have an "accrued benefit" of $2,500 per year ($10,000 X 1% X 25 years) and that a plan amendment actuarially reducing his accrued benefit below this amount (as does the Plan in the present case) would violate Sec. 204(g) (as revised). S.Rep. No. 575, 98th Cong., 2d Sess. 29; reprinted in 1984 U.S.Code Cong. & Ad.News 2547, 2575; H.R.Rep. No. 655, Pt. 2, 98th Cong., 2d Sess. 26-27 (1984). The House Committee Report adds that "[u]nder the bill, as under prior law, the plan amendment could not reduce [the employee's] accrued benefit below $2,500." (Emphasis supplied). Id. Although the 1984 Amendment revised ERISA Sec. 204(g), there is no indication that it changed the definition of "accrued benefit." But were the district court's and appellees' analysis correct, the employee's accrued benefit at the time of the plan amendment would not be $2,500 but the actuarial equivalent of a benefit of $2,500 payable commencing at normal retirement age.
 
 
 53
 The foregoing provisions of the 1984 Act are especially significant for present purposes because in reporting and explaining them the House Committee on Ways and Means stated that existing IRC provisions and IRS rulings (I.R.C. Sec. 411(d)(6), supra, and Rev.Rul. 81-12, 1981-C.B. 228) prohibiting "cutbacks in accrued benefits ... should be codified," and that "[t]he bill codifies present law generally precluding the elimination or reduction of benefits that have already been accrued by employees". Id. at 25-26. The Senate Finance Committee's report on the bill is more cautious, stating that "[t]he bill clarifies the scope of the prohibition against [decreases in "the accrued benefit of a participant"]" but that "[t]he committee intends that no inference is to be made on the basis of this clarification as to the scope of the prohibition before the effective date of the provision," S.Rep. No. 575, 98th Cong., 2d Sess. 28, reprinted in 1984 U.S.Code Cong. & Ad.News 2547, 2574. However, it is apparent that the Senate, although probably viewing the statute as a codification of existing law as interpreted by IRS regulations, did not want itself to be viewed as interfering with ongoing litigation.
 
 
 54
 We next turn to relevant Regulations issued by the Secretary of the Treasury under 26 U.S.C. Sec. 7805(a), with respect to the IRC and those sections of ERISA at issue here. See ERISA Reorganization Plan No. 4 of 1978, 5 U.S.C.App. Sec. 101 (1982); see also 29 C.F.R. Sec. 2530.200a-2 (1984) (regulations issued by the Secretary of the Treasury under I.R.C. Secs. 410 and 411 also apply for purposes of ERISA Secs. 202-204), and 26 C.F.R. Sec. 601.201(a)(3) (1984) (IRS "determination letters" apply "clearly established rules" to the facts of a case). The Supreme Court has "long recognized the primary authority of the IRS and its predecessors in construing the Internal Revenue Code," Bob Jones Univ. v. United States, supra, 461 U.S. at 596, 103 S.Ct. at 2031, and there exists a "strong presumption in favor of the validity of Treasury Regulations." Poirier & McLane Corp. v. C.I.R., 547 F.2d 161, 167 (2d Cir.1976), cert. denied, 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977). The Court has described as a "settled principle" that " 'Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law.' " United States v. Correll, 389 U.S. 299, 305-06, 88 S.Ct. 445, 448-49, 19 L.Ed.2d 537 (1967) (quoting Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52 (1938)). To prevail in a challenge to a Treasury Regulation, an appellant must establish that it is " 'unreasonable or plainly inconsistent with the Code itself.' " Solomon v. C.I.R., 570 F.2d 28, 32 n. 4 (2d Cir.1977) (quoting Bingler v. Johnson, 394 U.S. 741, 750, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969)).
 
 
 55
 Revenue rulings issued by the I.R.S. "are entitled to great deference, and have been said to 'have the force of legal precedents unless unreasonable or inconsistent with the provisions of the Internal Revenue Code.' " Fred H. McGrath & Son, Inc. v. United States, 549 F.Supp. 491, 493 (S.D.N.Y.1982) (quoting Dunn v. United States, 468 F.Supp. 991, 993 (S.D.N.Y.1979) (Weinfeld, J.)). See also Carle Foundation v. United States, 611 F.2d 1192, 1195 (7th Cir.1979), cert. denied, 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980) (revenue rulings entitled to be given "weight" by the courts).
 
 
 56
 The IRS has issued a number of rulings relevant to the issues in this case. In 1977 a Regulation, codified at 26 C.F.R. Sec. 1.411(d)-3(b) (1984), was issued construing IRC Sec. 411(d)(6), supra:
 
 
 57
 "(b) Prohibition against accrued benefit decrease. Under section 411(d)(6) a plan is not a qualified plan (and a trust forming a part of such plan is not a qualified trust) if a plan amendment decreases the accrued benefit of any plan participant, unless the plan amendment satisfies the requirements of section 412(c)(8) (relating to certain retroactive amendments) and the regulations thereunder. For purposes of determining whether or not any participant's accrued benefit is decreased, all the provisions of a plan affecting directly or indirectly the computation of accrued benefits which are amended with the same adoption and effective dates shall be treated as one plan amendment. Plan provisions indirectly affecting accrued benefits include, for example, provisions relating to years of service and breaks in service for determining benefit accrual, and to actuarial factors for determining optional or early retirement benefits." (Emphasis added).
 
 
 58
 To clarify what constitute "provisions indirectly affecting accrued benefits" and "actuarial factors for determining ... retirement benefits" the IRS later issued Revenue Ruling 81-12, which states in relevant part:
 
 
 59
 "Section 411(d)(6) of the Code and section 1.411(d)-3(b) of the regulations do not preclude a change in the actuarial basis. They do, however, preclude a change from decreasing a participant's accrued benefit. If the actuarial basis is being changed by a plan amendment and, as a result, any participant's accrued benefit may decrease, there are several acceptable methods that may be specified in the plan to prevent a decrease in an accrued benefit and a violation of section 411(d)(6)." 1981-1 C.B. 228.
 
 
 60
 Thus the prohibition of IRC Sec. 411(d)(6) against decreasing accrued benefits is to be applied broadly to bar not only provisions "directly" affecting computation of accrued benefits (which neither 26 C.F.R. Sec. 1.411(d)-3(b) (1984) nor Rev.Rul. 81-12 purports to enumerate) but also those "indirectly" doing so, such as changes affecting actuarial factors for determining early retirement benefits. Even if there were doubts about the IRS's interpretation, it would be entitled to enforcement. "[A] Treasury Regulation is not invalid simply because the statutory language will support a contrary interpretation." United States v. Vogel Fertilizer Co., 455 U.S. 16, 26, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982). We conclude that since the IRS' interpretation of the statutory language is neither " 'unreasonable [nor] plainly inconsistent with' the Code itself," Solomon, supra, 570 F.2d at 32 n. 4, it should be upheld.
 
 
 61
 Consistent with its position that a retroactive decrease in an early retirement benefit violates I.R.C. Sec. 411(d)(6) and Treasury Regulation Sec. 1.411(d)-3(b), the IRS on February 15, 1985 notified Western Union that it had made a proposed determination that the Plan, because of the Amendment, does not meet the requirements of I.R.C. Sec. 401. The IRS took the position that "a plan amendment which eliminates unreduced early retirement benefits, such as the amendment in question here, involves a change in the plan's actuarial factors that impermissibly affects accrued benefits." Brief for the United States as Amicus Curiae, at 8 n. 4. Defendants are entitled to appeal this proposed adverse determination. 26 C.F.R. Sec. 601.201(o)(6) (1984).
 
 
 62
 Although such written "determination letters" by the IRS, which are authorized by 26 C.F.R. Sec. 601.201(a)(3), "may not be used or cited as precedent," I.R.C. Sec. 6110(j)(3), they are entitled to some weight. Cf. Jewett v. C.I.R., 455 U.S. 305, 318, 102 S.Ct. 1082, 1090, 71 L.Ed.2d 170 (1982) (canon of construction that Commissioner's consistent interpretation of IRS Code is entitled to respect "is even more forceful when applied to the Commissioner's interpretation of his own Regulation"). The force of letters of determination is enhanced by the limited circumstances in which the IRS issues them:
 
 
 63
 "(3) A 'determination letter' is a written statement issued by a district director in response to a written inquiry by an individual or an organization that applies to the particular facts involved, the principles and precedents previously announced by the National Office. A determination letter is issued only where a determination can be made on the basis of clearly established rules as set forth in the statute, Treasury decision, or regulation, or by a ruling, opinion, or court decision published in the Internal Revenue Bulletin. Where such a determination cannot be made, such as where the question presented involves a novel issue or the matter is excluded from the jurisdiction of a district director by the provisions of paragraph (c) of this section, a determination letter will not be issued." 26 C.F.R. Sec. 601.201(a)(3) (1984).
 
 
 64
 The foregoing IRS interpretation of "accrued benefit" as used in I.R.C. Sec. 411(d)(6) is not inconsistent with Treas.Reg. Sec. 1.411(a)(7)(a)(1), relied upon by defendants, which in defining the term states that "[f]or purposes of this subparagraph a subsidized early retirement benefit which is provided by a plan is not taken into account...." However, the term "subsidized early retirement benefit" is not defined in the I.R.C., the Regulations promulgated thereunder, ERISA, the present Plan, or in the contemporaneous legislative history. We regard it as significant that in enacting Sec. 301(a)(2) of the Retirement Equity Act of 1984, P.L. 98-397, Congress provided that "early retirement benefit" and "retirement-type subsidy" be "defined in regulations." 29 U.S.C. Sec. 1054(g)(2)(A) (1985). In those circumstances we cannot agree that exclusion of "subsidized early retirement benefits" from the category of accrued benefits requires that benefits under the Class A and 75 Plans be excluded from that category.
 
 
 65
 Decisional law sheds little light on the issue raised here: whether an employer may terminate a plan's unreduced, funded early retirement benefits that are not contingent on an external event. The cases relied upon by defendants-appellees, Bencivenga v. Western Pa. Teamsters and Employers Pension Fund, 5 E.B.C. 1670 (W.D.Pa.1984), and Sutton v. Weirton Steel Div. of Nat'l Steel Corp., 567 F.Supp. 1184 (N.D.W.Va.), aff'd, 724 F.2d 406 (4th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984), and Petrella v. NL Industries, 529 F.Supp. 1357 (D.N.J.1982), are clearly distinguishable. Bencivenga simply assured that employees qualifying for an actuarially-reduced early retirement benefit would not receive pensions of greater actuarial value than those received at normal retirement age. Sutton held that unfunded, contingent early retirement severance payments do not amount to "accrued benefits" within the meaning of ERISA. In the present case, in contrast, the benefits are funded. Petrella did not involve a plan amendment but rather the termination of employees prior to their satisfying an age-condition precedent to qualification for pensions.
 
 
 66
 In contrast to the cases relied upon by defendants, two recent decisions lean in favor of plaintiffs' position. Hoover v. Cumberland, Maryland Teamsters' Pension Fund, 756 F.2d 977 (3d Cir.1985), held that a plan amendment, which reduced the calculation of partial pension benefits serving the primary function of providing retirement income, violated ERISA. Shaw v. Int'l Ass'n of M. & A.W. Pension Plan, 750 F.2d 1458, 1464 (9th Cir.1985), decided that, since a "living pension", which tied the amount of an early retirement pension to the current salary of the job from which the employee retired, did not amount to a "separate, unfunded, optional plan," it fitted within the category of "accrued benefits". The Class A and 75 pensions similarly are expressed in terms of the identical formula used to determine the benefits payable at normal retirement age.
 
 
 67
 Thus our review of the pertinent statutes and regulations in the light of Congress' expressed intent and Treasury regulations and interpretations satisfies us that the Western Union Amendment eliminating plaintiffs' unreduced early retirement benefits appears to violate ERISA Sec. 204(g) and I.R.C. Sec. 411(d)(6), which prohibit a decrease in a participant's "accrued benefit". The district court therefore erred in dismissing certain claims on the ground that unreduced early retirement benefits are not "accrued benefits" within the meaning of these statutes.
 
 Inurement
 
 68
 Since the district court relied on the erroneous ground that plaintiffs' unreduced early retirement benefits were not an "accrued benefit" in dismissing their claim that the Amendment violated ERISA's provision that a plan's assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan", ERISA Sec. 403(c)(1), 29 U.S.C. Sec. 1103(c)(1), its dismissal of plaintiffs' anti-inurement claim must be reversed and remanded for further consideration. We are unpersuaded by the additional ground Judge Sprizzo relied upon for dismissal of that claim, that a finding of illegal inurement would have the undesirable effect of encouraging underfunding of pension plans. This concern is diminished by ERISA's provisions insuring at least minimum funding. ERISA Secs. 302-305, 29 U.S.C. Secs. 1082-85, I.R.C. Sec. 412, 26 U.S.C. Sec. 412. In addition, ERISA Sec. 403(c)(1) protects the policy interest that employers not be permitted to eliminate certain kinds of non-accrued benefits solely for the purpose of using existing assets to meet other obligations under the pension plan.
 
 
 69
 The dismissibility of plaintiffs' inurement claim turns on whether WU as employer has withdrawn or threatens to withdraw from the Plan assets held to meet unreduced benefits payable to early retirees entitled to Class A and Class 75 pensions. If the employer has not done so and in accordance with our disposition of plaintiffs' claim that they are entitled to those unreduced early retirement pensions as accrued benefits, has retained the Plan assets needed to fund claims for such benefits, the dismissal of the inurement claim may stand since no assets will have inured to the employer's benefit, which means broadly to "become of advantage to the employer." Cf. Teamsters Local 639 v. Cassidy Trucking, Inc., 646 F.2d 865, 868 (4th Cir.1981). If, on the other hand, the assets held by WU to fund such benefits have been withdrawn from the Plan or WU has threatened to withdraw them, the dismissal must be reversed. Upon remand, therefore, the district court will be required to resolve this issue.
 
 Partial Termination
 
 70
 As part of their sixth cause of action,[1] plaintiffs allege that the Amendment resulted in a partial termination of the Plan, pursuant to I.R.C. Sec. 411(d)(3). The Plan provides that in the event of a partial termination benefits shall be allocated in accordance with ERISA Sec. 4044. Plan Agreement, Art. VIII, Sec. 4(a). ERISA Sec. 4044(a), 29 U.S.C. Sec. 1344(a), provides that, when a plan terminates, the plan administrator shall allocate the assets of the plan among the participants and beneficiaries in accordance with six enumerated categories. The fifth category is "all other nonforfeitable benefits under the plan," and the sixth is "all other benefits under the plan." 29 U.S.C. Sec. 1344(a)(5) & (6).
 
 
 71
 The district court proceeded on the assumption that whether a plan amendment has effected a partial termination must be determined by principles of contract interpretation, not tax rulings, and sua sponte held as a matter of law that no partial termination had occurred. In doing so it expressly took "no view as to whether the ... Amendment effected a partial termination under the treasury regulations and revenue rulings cited by plaintiffs." 596 F.Supp. at 971 n. 9. In our view this holding was error, requiring reversal. We have recently held that, in determining whether a partial termination has occurred, courts should accord "great weight" to the regulations and rulings of the Internal Revenue Service. Weil v. Retirement Plan Administrative Comm., 750 F.2d 10, 12 (2d Cir.1984); see also Wishner v. St. Luke's Hosp., 550 F.Supp. 1016 (S.D.N.Y.1982); Ehm v. Phillips Petroleum Co., 583 F.Supp. 1113 (D.Kan.1984). But see United Steelworkers of Am. v. Harris & Sons Steel Co., 706 F.2d 1289 (3d Cir.1983). The applicable regulations of the Secretary of the Treasury provide in pertinent part that
 
 
 72
 "whether or not a partial termination occurs when benefits or employer contributions are reduced, or the eligibility or vesting requirements under the plan are made less liberal, will be determined on the basis of all the facts and circumstances." Treas.Reg. Sec. 1.401-6(b)(2) (1963).
 
 
 73
 See also Rev.Rul. 81-27, 1981-1 C.B. 228; Rev.Rul. 73-284, 1973-2 C.B. 139; Rev.Rul. 72-510, 1972-2 C.B. 223; Rev.Rul. 72-439, 1972-2 C.B. 223. Upon remand the district court must consider whether, on the facts of this case, a partial termination has occurred.
 
 
 74
 Appellants further contend that the alleged partial termination entitles them under ERISA Sec. 4044, 29 U.S.C. Sec. 1344, to all their benefits under the plan, whether or not those benefits are accrued. They assert that their "individual interests in their Class A and Class 75 benefits to be met out of the allocated fund would be expressed as a fraction which corresponds to the portion of the Class 75 benefit already earned, e.g., 70/75." Appellants' Brief, at 14 n. 12. Having found that plaintiffs' Class A and 75 benefits were not accrued, the district court held that ERISA Sec. 4044 did not entitle them to distribution of any unaccrued benefits they had under the plan. This holding is not supported by the statutory language of ERISA Sec. 4044(a), the regulations construing it, or its legislative history.
 
 
 75
 ERISA Sec. 4044(a) provides for allocation, in its sixth and last category, of "all other benefits under the plan", not "all other accrued benefits," and thus would entitle appellants upon partial termination to their Class A and 75 benefits under the Plan, regardless of whether they had accrued.
 
 
 76
 The Regulation construing the sixth category supports this interpretation of the statutory language:
 
 
 77
 "The benefits assigned to priority category 6 with respect to each participant are all of the participant's benefits under the plan, whether forfeitable or nonforfeitable." 29 C.F.R. Sec. 2618.16 (1984).
 
 
 78
 In an attempt to rebut the plain language of this regulation, appellees rely on the following comment by the Pension Benefit Guaranty Corporation, the agency responsible under ERISA for the distribution of plan assets upon termination, with respect to an earlier similar version of category six:
 
 
 79
 "Priority category 6, covered in proposed Sec. 2608.11, contains all plan benefits with respect to a participant not assigned to priority categories 1 through 5. Thus, priority category 6 will contain the value of accrued forfeitable benefits of a participant." 40 Fed.Reg. 51368, 51370 (Nov. 4, 1975).
 
 
 80
 Appellees interpret this comment to say that only accrued forfeitable benefits are to be allocated under category six. We disagree. The comment does not say "only". In view of the unambiguous language of the regulation itself it is more reasonably construed as asserting that accrued, nonforfeitable benefits are among the benefits to be allocated upon a plan termination.
 
 
 81
 The legislative history provides no support for appellees' interpretation. They cite the following passage:
 
 
 82
 "Under the conference substitute, as under present law, all accrued benefits in a qualified pension plan must become fully vested (in accordance with the rules of the bill concerning allocation of assets upon plan termination and to the extent then funded) in the event of a plan termination." H.Conf.Rep. No. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4630, 5038, 5058.
 
 
 83
 In view of this passage's reference to "the rules ... concerning allocation of assets upon plan termination," appellees ask us to import "all accrued benefits" into the language of ERISA Sec. 4044, which governs allocation of assets. We decline the invitation. The passage refers to I.R.C. Sec. 411(d)(3) (vesting and related rules) and to its interest in the vesting of funded, accrued benefits upon plan termination, not to ERISA Sec. 4044 (allocation of assets).
 
 
 84
 The Joint Explanatory Statement of the Senate-House Conference Committee on the history of ERISA Sec. 4044 supports appellants' argument that category six is not limited to accrued benefits. H.Conf.Rep. No. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 5038, 5154-55. The House version of the bill included among the benefits for which funds had to be allocated a category entitled "other accrued benefits." The Conference rejected this version and substituted "all other benefits under the Plan", the language of the present statute. Congress thus decided not to limit the allocation requirement to accrued benefits but to require that, as long as assets were available, they should be used to meet participants' benefit expectations based upon the Plan's full benefit structure.
 
 Alleged Breaches of Fiduciary Duty
 
 85
 Plaintiffs' first cause of action alleges that defendants have violated the general fiduciary standards of ERISA Sec. 404(a)(1), which provide in relevant part:
 
 
 86
 "Sec. 404. (a)(1) Subject to sections 403(c) and (d), 4042, and 4044, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 
 
 87
 (A) for the exclusive purpose of:
 
 
 88
 (i) providing benefits to participants and their beneficiaries; and
 
 
 89
 (ii) defraying reasonable expenses of administering the plan;
 
 
 90
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
 
 
 91
 * * *
 
 
 92
 * * *
 
 
 93
 (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title or title IV." 29 U.S.C. Sec. 1104(a)(1)(A), (B) & (D).
 
 
 94
 In rejecting this claim, the district court relied on ERISA Sec. 3(21)(A), which provides that:
 
 
 95
 "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 405(c)(1)(B)." 29 U.S.C. Sec. 1002(21)(A).
 
 
 96
 Judge Sprizzo concluded that ERISA permits employers to wear "two hats," and that they assume fiduciary status "only when and to the extent" that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA. 596 F.Supp. at 968. We agree. WU's officers acted on behalf of a corporate employer and not as Plan fiduciaries in amending its pension plan. On the other hand, they also owe a "duty ... [as] ... trustees to avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir.), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).
 
 
 97
 Although the complaint is vulnerable to the extent that it fails to distinguish between defendants' duties as corporate officers and those as Plan trustees, it does allege a conspiracy on the part of the defendants to enact and implement the Plan amendment as a means of creating a multi-million dollar surplus in the pension trust that would be used for the benefit of the defendants and have the effect of depriving plaintiffs of pension benefits to which they are entitled. To the extent that defendants, wearing their hats as Plan fiduciaries, cooperated in creating such a surplus and diverting it from being held solely for the benefit of plaintiffs and other Class A and Class 75 pensioners, or misled plaintiffs with respect to their rights under the Plan, a valid claim for breach of fiduciary duty is stated. However, if, as we have noted above in our discussion of plaintiffs' inurement claim, the assets required to be held by WU to fund Class A and Class 75 pension benefits have not been withdrawn from the Plan and WU has not threatened to withdraw them from it, the dismissal of the breach of fiduciary claim must be upheld. Accordingly, the dismissal of the claim must be reversed and remanded for further consideration.
 
 
 98
 Plaintiffs' third cause of action alleges that Western Union violated certain specific fiduciary prohibitions contained in ERISA Sec. 406, which provides in relevant part:
 
 
 99
 "(a)(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--
 
 
 100
 (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan;
 
 
 101
 (b) A fiduciary with respect to a plan shall not--
 
 
 102
 (1) deal with the assets of the plan in his own interest or for his own account;
 
 
 103
 (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U.S.C. Sec. 1106.
 
 
 104
 We agree with the district court that our decision in Donovan v. Bierwith, supra, which rejected a broad interpretation of the transactions prohibited by ERISA Sec. 406, 29 U.S.C. Sec. 1106, bars this claim. As we there stated:
 
 
 105
 "We read this section of the statute [Sec. 406] as requiring a transaction between the plan and a party having an adverse interest." 680 F.2d at 270.
 
 
 106
 No such "transaction" with a party having an adverse interest and no self-dealing of the appropriate sort is alleged in the present case.[2]
 
 Common-Law Claims
 
 107
 (1) Breach of the Summary Plan Description
 
 
 108
 As an element of their seventh cause of action, plaintiffs contend that defendants violated the following terms of the Summary Plan Description:
 
 
 109
 "CONTINUANCE OF THE PLAN
 
 
 110
 "The Company intends to continue the Plan indefinitely and to meet any foreseeable situations that may occur. To protect against any unforeseen situations, however, the Company does reserve the right to change or even terminate the Plan. If it becomes necessary to discontinue the Plan, the assets of the Pension Fund held by the Trustee will be used to provide benefits according to the terms of the Plan and the Trust Agreement. A Plan discontinuance may result in reduction of pension payments to certain highly compensated employees, in accordance with the requirements of the Internal Revenue Service."
 
 
 111
 The district court rejected this claim, finding that the breach of contract claim was cognizable under ERISA and thus governed by federal common law, ERISA Sec. 514, 29 U.S.C. Sec. 1144, but holding that there was no breach. We agree.
 
 
 112
 It is true that the summary qualifies Western Union's right to change the Plan by implying that it would be done only to protect against "unforeseen situations", which are not defined, and that the summary leaves open the question of whether the defendants' alleged elimination of some 613 people from the Plan--about 60% of their employees--was an "unforeseen" circumstance making it "necessary to discontinue the Plan". There may also be a question of the extent to which the initial statement that the employer "intends to continue the Plan indefinitely" qualifies the meaning of what follows. However, the summary also reserves to WU the right to amend the Plan and states that the terms of the Plan and related trust agreement "will govern in all cases." These unambiguous provisions preclude any separate contract claim based solely on the language of the summary plan description. Accordingly, we affirm the dismissal of this claim.
 
 
 113
 (2) Breach of Plan and Trust Agreement
 
 
 114
 As an additional element of their seventh cause of action, plaintiffs contend that defendants have violated specific provisions of the Plan and Trust Agreement documents. ERISA Sec. 502, 29 U.S.C. Sec. 1132, provides for enforcement of the terms of a plan agreement and gives a participant or beneficiary the right to bring a civil action. The district court rejected this claim on the grounds that there was no violation of a specific ERISA provision or of the terms of the agreement. In reaching the latter conclusion, the court focused solely on the Plan's statement that "Western Union International may amend, terminate or suspend this Plan at any time or from time to time...." Art. VIII, Sec. 1. However, the mere presence of a "right to amend or terminate" clause in a complex document is not so unambiguous as to be dispositive of plaintiffs' claim. See, e.g., Eardman v. Bethlehem Steel Corp., 607 F.Supp. 196, 5 E.B.C. 1985 (W.D.N.Y.1984).
 
 
 115
 We therefore reverse the dismissal of this claim and remand for consideration of the quoted language in the context of the balance of Art. VIII, including its Sec. 1, (a), (b), and (c), immediately following the "provided, however, that" language. Upon remand the district court should consider the implications for plaintiffs' breach of contract claim of our finding that the complaint states a cognizable claim that specific ERISA provisions have been violated, especially in view of appellees' acknowledgement that the Plan provisions on which appellants rely, see, e.g., Plan Art. VII, Sec. 18; Plan Art. VIII, Sec. 1(a) & (b); Plan Art. X, Sec. 2; Trust Agreement Sec. 9.1(b), "merely restate or mirror provisions in ERISA." (Appellees Brief, at 35).[3] To the extent that a state law claim duplicates one based on a violation of ERISA it is preempted by ERISA, 29 U.S.C. Sec. 1144(a).
 
 
 116
 (3) Unjust Enrichment
 
 
 117
 Plaintiffs' ninth cause of action alleges that "[i]mplementation of the November 16, 1982 Amendment to the Plan has unjustly enriched or will unjustly enrich defendants by creating a surplus...." Compl. p 45. Finding that ERISA Sec. 514(a), 29 U.S.C. Sec. 1144(a), has preempted any state common law claim for unjust enrichment, the district court relied on Van Orman v. American Insurance Co., 680 F.2d 306, 310-13 (3rd Cir.1982), for the proposition that "there is no federal common law of unjust enrichment under ERISA." 596 F.Supp. at 973. We affirm this holding, though on a narrower basis.
 
 
 118
 In appropriate circumstances, courts may develop a federal common law under ERISA. See, e.g., Menhorn v. Firestone Tire & Rubber Co., 738 F.2d 1496, 1499 (9th Cir.1984) (ERISA federal common law serves three related ends). However, "[w]here Congress has established an extensive regulatory network and has expressly announced its intention to occupy the field, federal courts will not lightly create additional rights under the rubric of federal common law." Van Orman, supra, 680 F.2d at 312. Such is the case with the ERISA provisions before us here, which are "comprehensive and reticulated". Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 510, 101 S.Ct. 1895, 1899, 68 L.Ed.2d 402 (1981) (quoting Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980)). Given our interpretation of ERISA Sec. 403(c)(1)'s anti-inurement provision and of the obligations ERISA Sec. 404(a)(1) imposes on pension fund fiduciaries, we find no need in the circumstances of this case to supplement these specific statutory sections with an ERISA common law of unjust enrichment. The dismissal of the ninth cause of action is therefore affirmed.
 
 
 119
 (4) Third-Party Beneficiary/Equitable Estoppel
 
 
 120
 Plaintiffs' tenth cause of action alleges that they are third-party beneficiaries of the following provision of the Purchase and Sale Agreement between Xerox and MCI:
 
 
 121
 "Employee benefits. Each of M.C.I. and purchaser agrees that, following the Closing, it shall take no action to reduce existing pension or other benefits of the Company's employees." Art. VIII, Sec. 8.02.
 
 
 122
 Defendants claim that "Company's employees" refers only to the employees of Western Union's holding company, WUI, Inc., not those of Western Union itself. Plaintiffs, however, contend in their twelfth cause of action that defendants, by reason of its assurances to them upon which they relied, are estopped from denying that the agreement refers to them. Having dismissed plaintiffs' underlying federal claim, the district court also dismissed these two causes of action as pendent state claims unrelated to any federal claim that had not been dismissed. Having held that plaintiffs' underlying federal claims should not have been dismissed, we must now consider these pendent claims.
 
 
 123
 ERISA Sec. 514(a) provides that "the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 19 U.S.C. Sec. 1144(a). Plaintiffs maintain that ERISA thus requires the development of a federal common law of third-party beneficiary rights governing interpretation of agreements concerning the purchase and sale of stock and assets. We need not decide this issue, however, since even if the development of a federal common law were appropriate, in the circumstances of this case the court would properly look to state law as a source for federal law. See Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943) ("In our choice of the applicable federal rule we have occasionally selected state law.") In interpreting this contract, we thus look to New York law. Cf. Purchase and Sale Agreement, Art. VIII, Sec. 8.12 (specifying that New York law should control).
 
 
 124
 Defendants forcefully argue that "Company" is defined in the Agreement to refer only to WUI, Inc., and that it is consistently so used throughout the Agreement. "Subsidiaries" of WUI, Inc. are consistently distinguished from the "Company," while Western Union is identified in Appendix B as one of WUI, Inc.'s "subsidiaries." They further argue that the contracting parties' intent to benefit a third party must be evident from the "four corners" of the instrument, thereby barring--because of the Agreement's consistent use of "company"--plaintiffs' claims.
 
 
 125
 We decline to hold that plaintiffs should be barred from presenting extrinsic evidence in support of their claim that "Company's employees" was not limited to the employees of WUI, Inc. The case on which defendants most heavily rely, Stainless, Inc. v. Employers' Fire Insurance Co., 69 A.D.2d 27, 418 N.Y.S.2d 76 (1st Dep't 1979), aff'd mem., 49 N.Y.2d 924, 428 N.Y.S.2d 675, 406 N.E.2d 490 (1980), is distinguishable. In Stainless, a party sought to claim rights as a third-party beneficiary of a contract between the Employers' Fire Insurance Co. and the assured, Plains. The court rejected this claim on the ground that "[t]here is no expressed intention [in the contract] to cover any party other than the named assured." 69 A.D.2d at 33, 418 N.Y.S.2d at 80. Here, on the other hand, there is clearly an expressed intention to benefit a third party, i.e., the "company's employees." Unlike Stainless, the issue here is the identity of the parties who can claim third-party beneficiary rights. Given the clarity of the intent to benefit third parties, we reverse the dismissal of the pendent claims and hold that on remand it will be appropriate for the parties to introduce extrinsic evidence regarding the employees intended to be benefited by Agreement Art. VIII, Sec. 8.02.
 
 
 126
 Should the court determine that plaintiffs were not intended beneficiaries under the Agreement, it will still be necessary to consider their claim that defendants should be equitably estopped from enforcing the actual terms of the MCI/Xerox Agreement. Plaintiffs have alleged that "[a]t or about the time the Purchase and Sale Agreement was negotiated" they were "assured directly or indirectly by defendants that Sec. 8.02 of said agreement was for their benefit...." Compl. p 54. Defendants maintain that this allegation fails to satisfy the "basic" element of a claim of promissory estoppel that "an oral promise must be made contemporaneously with or subsequent to the making of a written agreement." Philo Smith & Co. v. USLIFE Corp., 420 F.Supp. 1266, 1271 (S.D.N.Y.1976) (emphasis added), aff'd, 554 F.2d 34 (2d Cir.1977) (per curiam). We disagree. On this particular point, plaintiffs' allegations are sufficient to survive a motion to dismiss. Nor does Loews Corp. v. Sperry Corp., 86 A.D.2d 221, 449 N.Y.S.2d 715 (1st Dep't 1982), on which defendants rely, rule out plaintiffs' claim. In Loews, the court refused to create a contract between two other parties by estoppel. Here plaintiffs claim that a contract already existed, and that they either are its intended beneficiaries, or that defendants are estopped from denying them the protection purportedly given by that contract.
 
 CONCLUSION
 
 127
 The allegations of the complaint, that the Amendment deprives plaintiffs of unreduced early retirement benefits promised by the Plan, in reliance upon which they worked for many years, state some cognizable claims for relief under ERISA and at common law. Other claims, however, are insufficient.
 
 
 128
 For the foregoing reasons we affirm the district court's dismissal of the third, fourth, ninth and eleventh causes of action of the complaint and that portion of the seventh cause of action claiming a breach of the Summary Plan Description. We reverse the district court's dismissal of all other causes of action (except a portion of the sixth), and we remand the case to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 The district court found that that part of plaintiff's sixth cause of action alleging that Western Union had breached its fiduciary duties as plan administrator for failure to report a "reportable event" under ERISA Sec. 4043, 29 U.S.C. Sec. 1343, did state a claim on which relief could be granted. Defendants have not appealed this finding. It also found that plaintiffs had "abandoned" their 4th cause of action, 596 F.Supp. at 967 n. 5, which alleged that the November Amendment impermissibly deprived them of vested benefits. Plaintiffs have not argued this issue on appeal
 
 
 [2]
 This case therefore differs from those cited by us in Donovan as examples of transactions with a party having an adverse interest. See, e.g., Gilliam v. Edwards, 492 F.Supp. 1255 (D.N.J.1980) (party who was already trustee of pension fund and business manager of parent union of fund caused fund to enter contract with him hiring him as plan administrator); Marshall v. Kelly, 465 F.Supp. 341 (W.D.Ok.1978) (trustee of pension plan caused plan to make loans to himself and to company he owned, to make $45,000 payment to the company, and $9,000 payment to himself)
 
 
 [3]
 On appeal plaintiffs have not sought to revive their 11th cause of action, in which they alleged that the Plan incorporated the Purchase and Sale Agreement, and that defendants' violation of the latter was necessarily a violation of the former